**In re Daniel J. LEES, Debtor.**

**Daniel J. Lees, Plaintiff,**

**v.**

**Tennessee Student Assistance Corporation, et al., Defendant.**

**No. 00–2808 D/A.**

United States District Court, W.D. Tennessee, Western Division.

July 26, 2001.

Russell W. Savory, Gotten Wilson & Savory, Memphis, TN, for plaintiff.

Marvin E. Clements, Jr., Office of the Attorney General, Criminal Justice Division, Sally Ramsey, Office of the Attorney General, Tax Division, Bankruptcy Unit, Martha S. Davis, Attorney General and Reporter, Tax Division, Nashville, TN, for defendant.

David S. Kennedy, U.S. Bankruptcy Court Judge, Memphis, TN, pro se.

Jed G. Weintraub, Clerk of Court, United States Bankruptcy Court, Memphis, TN, pro se.

**ON APPEAL FROM THE BANKRUPTCY COURT, OPINION AFFIRMING, ON ALTERNATIVE GROUNDS, THE BANKRUPTCY COURT'S DECISION DENYING DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

DONALD, District Judge.

Defendant, the Tennessee Student Assistance Corporation ("TSAC"), appeals

the Bankruptcy Court's finding that it has subject matter jurisdiction. Defendant asserts that it is an arm of the state, and under the Eleventh Amendment, immune from suit. The Court has jurisdiction to review the Bankruptcy Court's decision under 28 U.S.C. § 1334 and 11 U.S.C. § 158(a). For the reasons herein, the Court **AFFIRMS, on alternative grounds,** the Bankruptcy Court's decision denying Defendant's motion to dismiss for lack of subject matter jurisdiction.

## I. Factual and Procedural Background

Title 11 U.S.C. § 523(a)(8) provides that educational loan payments (student loans) may be discharged in bankruptcy if making such payments imposes an undue hardship on the debtor. Specifically, § 523(a)(8) states:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) of this title does not discharge an individual debtor from any debt—
>
> > (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or non profit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless—
> >
> > (B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

Plaintiff Daniel Lees filed a complaint demanding that TSAC discharge his student loans pursuant to § 523(a)(8)(B). In response, TSAC asserted that, under the Eleventh Amendment, it was immune from Plaintiff's federal bankruptcy claim. Although Plaintiff did not agree that TSAC was an arm of the state and therefore eligible to assert sovereign immunity,

Plaintiff invoked § 106(a) of the Bankruptcy Code, which provides that "sovereign immunity is abrogated as to a governmental unit" regarding claims brought under § 523.

Bankruptcy Judge David S. Kennedy found that TSAC was a state agency, but nevertheless subject to suit under 11 U.S.C. § 106(a). Judge Kennedy reasoned that the Bankruptcy Clause gave Congress the power to abrogate Eleventh Amendment immunity. Alternatively, Judge Kennedy found that § 106(a) removed the Eleventh Amendment shield because Congress passed it pursuant to § 5 of the Fourteenth Amendment. On August 2, 2000, TSAC filed a notice of appeal with the Bankruptcy Court of the Western District of Tennessee. Pursuant to Fed. R.Bankr.P. 8003(c), this Court found interlocutory review appropriate.

## II. Analysis

■ Sovereign immunity derives from the theory that states retain attributes of their pre-Constitution sovereignty, and from the structure of the Constitution itself. *Alden v. Maine,* 527 U.S. 706, 748, 119 S.Ct. 2240, 2263, 144 L.Ed.2d 636. The Eleventh Amendment shields states from federal claims brought by individuals in either state or federal courts. *Id.* at 752, 754, 119 S.Ct. at 2265–66. Courts treat sovereign immunity issues with great care, sensitive to the impropriety of subjecting a sovereign to the unlawful will of another sovereign. *See Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 58, 116 S.Ct. 1114, 1124, 134 L.Ed.2d 252 (1996) (stating that the Eleventh Amendment serves to avoid the "indignity of subjecting a state to the coercive process of judicial tribunals at the instance of private parties"); *Alpha Therapeutic Corp. v. Nippon Hoso Kyokai,* 199 F.3d 1078, 1087–88 (9th Cir.1999);

*Vickery v. Jones,* 100 F.3d 1334, 1346–47 (7th Cir.1996).

■ Plaintiff first contends that the bankruptcy court has subject matter jurisdiction because TSAC is not an arm of the state, and therefore is not afforded Eleventh Amendment immunity. Alternatively, Plaintiff asserts that, even if TSAC is an arm of the state, Congress has power to abrogate sovereign immunity through its power pursuant to either (1) the Bankruptcy Clause; or (2) § 5 of the Fourteenth Amendment.

## A. Arm of the state

■ The Eleventh Amendment helps ensure that a state enjoy the undisturbed discretion to structure its government and administer its public affairs. *Blake v. Kline,* 612 F.2d 718, 725. Eleventh Amendment protection, however, only extends to suits prosecuted against a governmental entity that has a close nexus to the state. *Alden,* 527 U.S. at 706, 119 S.Ct. at 2267; Rogers, Alex E., *Clothing State Governmental Entities with Sovereign Immunity: Disarray in the Eleventh Amendment Arm-of the State Doctrine,* 92 Colum.L.Rev. 1243, 1243, (1992). The spectrum ranges from protected entities such as states and state officials to unprotected entities such as counties and municipal corporations. *Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). TSAC and other similarly hybrid entities fall somewhere in the middle of this spectrum.

■ The term "arm of the state" refers to an entity that receives Eleventh Amendment protection, and the term "political subdivision" refers to an entity that does not. *Lake Country Estates v. Tahoe Regional Planning Agency,* 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979). Determining whether an entity is an arm of the state or a political subdivision may settle whether an entity is permitted to perform its public functions free from the fear that its resources are vulnerable to federal claims brought by individuals. This determination therefore deserves careful scrutiny, as receiving the status of "arm of the state" is the first step required of any entity attempting to place its own parochial interests above the Nation's. *City of Lafayette, La. v. Louisiana Power & Light Co.,* 435 U.S. 389, 413, 98 S.Ct. 1123, 1136, 55 L.Ed.2d 364 (1978).

■■ Whether a local entity is an arm of the state under the Eleventh Amendment is a question of federal law. *Regents of University of Calif. v. Doe,* 519 U.S. 425, 430 n. 5, 117 S.Ct. 900, 904, 137 L.Ed.2d 55 (1997). That question, however, can only be answered by referring to state law provisions defining the agency's character. *Id.* Courts consider numerous factors in evaluating the nexus between the entity and the state, including (1) state law characterization of the entity; (2) whether state treasury funds would be used to satisfy the judgment, and the degree to which the state has insulated itself from responsibility for the agency's operations; (3) the degree the state controls the entity's operations, and conversely the degree of discretion an entity has in controlling its own affairs, such as the power to issue bonds and to levy taxes; (4) the source of the agency's funding; and (5) whether the agency is performing a governmental or proprietary function. *Mt. Healthy,* 429 U.S. at 280, 97 S.Ct. at 572–73; *Lake Country Estates,* 440 U.S. at 401–402, 99 S.Ct. at 1177–78; *Brotherton v. Cleveland,* 173 F.3d 552, 560 (6th Cir.1999) (citing *Hufford v. Rodgers,* 912 F.2d 1338 (11th Cir.1990); *Duke v. Grady Mun. Schs.,* 127 F.3d 972, 978 (10th Cir.1997); *Puerto Rico Ports Auth. v. M/V Manhattan Prince,* 897 F.2d 1, 9 (1st Cir.1990)). The Sixth Circuit approves of a multi-factored analysis.

*Brotherton,* 173 F.3d at 560 (citing to the Second, Third, Fourth, Eighth Circuits, and emphasizing the Tenth Circuit's treatment, as well as the Eleventh Circuit's approach, which focused on the first four prongs listed above).

■ Various bankruptcy courts have found, implicitly or explicitly, that because TSAC is created by the state, it is an arm of the state. *See, e.g., Seay v. TSAC,* 244 B.R. 112, 114 & n. 2 (Bankr.E.D.Tenn. 2000) (finding that "TSAC is a governmental corporation created by the statutes of Tennessee for the purpose of facilitating student loans in the state. As such it is an arm or agency of the state of Tennessee."); *Arnold v. TSAC,* 255 B.R. 845, 848 (Bankr. W.D.Tenn.2000); *Dodson v. TSAC,* 259 B.R. 635, 638 (Bankr.E.D.Tenn.2001) (citing *Seay,* 244 B.R. at 114). These decisions, however, fail to consider factors that the United States Supreme Court and Sixth Circuit[1] apply in determining whether an entity is an arm of the state. Further, the mere fact that a state creates an entity has little bearing on whether it is an arm of the state. *See Hess v. Port Authority Trans–Hudson Corp.,* 513 U.S. 30, 47, 115 S.Ct. 394, 404, 130 L.Ed.2d 245 (1994); *Southwestern Bell Telephone Co. v. City of El Paso,* 243 F.3d 936, 940 (5th Cir.2001).

### 1. *State law characterization of TSAC*

■ Courts find the state law's characterization of the entity a decisive factor. Rogers, 92 Colum.L.Rev. at 1269 (*citing Korgich v. Regents of N.M. Sch. of Mines,* 582 F.2d 549, 551 (10th Cir.1978); *Blake v. Kline,* 612 F.2d 718, 722 (3d Cir.1979)).

Courts first look to the enabling statute to determine how the state characterizes the entity at issue. *See, e.g., Mt. Healthy,* 429 U.S. at 280, 97 S.Ct. at 572–73. In *Mt. Healthy,* for example, the Court found that under Ohio law (1) the "state" did not include "political subdivisions"; and (2) school boards were defined as political subdivisions. Ohio law therefore weighed against affording the school board sovereign immunity. Courts not only look to the enabling statute, but also look to subsequent state court decisions addressing the entity. *Moor v. County of Alameda,* 411 U.S. 693, 721, 93 S.Ct. 1785, 1802, 36 L.Ed.2d 596 (1973). In the present case, however, state decisional law involving TSAC does not explore the nexus between TSAC and Tennessee. *See, e.g., Nichols,* 1995 WL 614335, at *1; *Moskal v. First Tennessee Bank,* 815 S.W.2d 509 (Tenn.Ct. App.1991).

TSAC is a non-profit corporation created by the General Assembly to guarantee and administer loans made by educational institution lenders to students attending post-secondary schools in Tennessee. T.C.A. §§ 49–4–203(1)–(3) (1990); *Nichols v. Tennessee Student Assistance Corp.,* No. 01A01–9506–CH–00247 1995 WL 614335, *1 (Tenn.Ct.App. Oct. 20, 1995). All corporations, however, are creatures of state law. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977). In fact, Tennessee law allows any five or more persons to establish a non-profit corporation for the purpose of administering financial aid, subject to the same operating regulations

---

1. In *Hood v. TSAC,* 262 B.R. 412 (6th Cir. BAP 2001), the Sixth Circuit decided the question of whether states ceded their sovereignty over discharge matters in bankruptcy as a part of the plan of the Constitutional Convention. Although TSAC was a party, the Sixth Circuit did not address the antecedent question of whether TSAC was indeed an arm of the state, and therefore eligible for Eleventh Amendment protection. In oral hearings of the instant case, parties informed the Court that this issue had not been briefed by the parties in *Hood.*

as TSAC. § 49–4–105. TSAC's non-profit and corporate structure is of little help in determining whether it is an arm of the state. *Mancuso v. New York State Thruway Auth.*, 86 F.3d 289, 294 (2nd Cir.1996); *McGinty v. New York*, 251 F.3d 84 (2nd Cir.2001). The question facing the Court is whether TSAC's legislatively created structure so distinguishes it from other corporations that, despite being creatures of state law, are autonomous entities that are distinct from the state.

The statute empowers TSAC and other non-profit entities to perform the special function of administering financial aid for students. §§ 49–4–105, 202–207. This characteristic, however, is similar to the characteristic of a non-profit organization that the Sixth Circuit found to be autonomous in *Brotherton*, 173 F.3d at 561. In *Brotherton*, Ohio law gave the non-profit entity permission to perform a special function, which the court found did little to show that the legislature intended it to be a state agency.

In the instant case, however, TSAC must also follow a state mandate: to receive any state funds appropriated for the purpose of guaranteeing student loans. § 49–4–203. The fact that TSAC's raison d'etre is to manage funds appropriated by the Legislature, however, does not establish that the Legislature intended that TSAC be synonymous with the "state." In fact, the statute in no way guarantees that TSAC will be able to perform this duty, as state funding is not guaranteed. § 49–4–207 (requiring that funds be requested). Instead, absent any state monies, TSAC would still perform its special functions with funds it receives from federal and private sources. The Court finds that the statute itself does not reveal whether the Legislature intended TSAC to be a state entity. Neither the Tennessee Constitution nor the enabling statute provide any language that suggests TSAC is either an arm of the state or a political subdivision.

### 2. *State's financial responsibility for TSAC's actions*

In the Sixth Circuit, whether or not the state is liable for paying any judgment against the entity is the most important factor in determining whether the entity is an arm of the state. *Hess v. Port Auth. Trans–Hudson Corp.*, 513 U.S. 30, 48, 115 S.Ct. 394, 404, 130 L.Ed.2d 245 (1994); *Brotherton*, 173 F.3d at 561. When the state is not obligated to bear and pay the resulting indebtedness of the enterprise, then the Eleventh Amendment's core concern is not implicated, either legally or practically. *Hess*, 513 U.S. at 51, 115 S.Ct. at 406.

According to § 49–4–403, the state is "in no event" liable for any loss of funds or for any act of TSAC. Although TSAC argues that the state did bail out TSAC on one occasion, nothing is suggested from the record or from the enabling statute, however, that the state was obliged to pay TSAC's debts. Further, as a practical matter, it could be argued that if TSAC is liable for damages, it would produce a higher operating budget shortfall, which would conceivably be covered by the appropriation of state monies. *See Hadley v. North Ark. Community Technical College*, 76 F.3d 1437, 1441 (8th Cir.1996). This argument, however, fails for two reasons. First, the state is not required, as it was in *Hadley*, to provide a guaranteed level of financing. The state could therefore deny any additional funding requests of TSAC. Second, the question is not who pays in the end, but who is legally obligated to pay the judgment that is being sought. *Doe*, 519 U.S. at 428, 431, 117 S.Ct. at 903–04. The statute is explicit in shielding the state from any liability attaching to TSAC. Therefore, this factor weighs heavily against finding TSAC an arm of the state.

### 3. State control of TSAC versus TSAC's autonomy

■ In determining the degree of control a state has over a commission or corporation, the composition and role of the entity's governing board is commonly evaluated. *Lake Country Estates*, 440 U.S. at 401, 99 S.Ct. at 1177. Courts will look to whether members are state officials, or rather are county or municipal officials, or private citizens. *Hess*, 513 U.S. at 36, 115 S.Ct. at 399; *Lake Country Estates*, 440 U.S. at 401, 99 S.Ct. at 1177.

TSAC's board of directors include private citizens, including a commercial lender, a student enrolled in an institution of higher education, and three private citizens. Other members also appear to be from the private sector, including the presidents of the Tennessee Council of Private Colleges, the Tennessee Proprietary Business School Association, and the Tennessee Association of Student Financial Aid Administrators, as well as the chairman of the Tennessee Council of Private Colleges. Some members are clearly state officials, including the governor, the state treasurer, the comptroller of the treasury, and the commissioner of finance and administration; while others appear to be state officials, including the president of the University of Tennessee, the director of the higher education commission, and the chancellor of the Board of Regents. § 49–4–202(a). Thus it appears that nine members of TSAC's Board are private citizens, while seven are state officials. *See Lake Country Estates*, 440 U.S. at 401, 99 S.Ct. at 1177 (finding it instructive that only four of the ten governing members of a commission were state appointed).

The state officials on the Board may designate an alternative representative who "shall have full authority" to vote on and participate in most of TSAC's functions. § 49–4–202(e). Accordingly, the Board of Directors could theoretically consist of private citizens who nevertheless have broad discretion to operate TSAC. In fact, the minutes from meetings in 1995 and 1998 suggest that seven individuals sat in a representative capacity. Moreover, no state official retains the right to veto TSAC's proposed regulations. In *Lake Country Estates*, where the entity at issue was determined not to be an arm of the state, the Supreme Court found it significant that the state did not retain power to veto the entity's decisions regarding its primary functions. 440 U.S. at 402, 99 S.Ct. at 1177. The Court finds that the state members are not only in the minority, but also exercise their right to substitute non-state officials to represent their position. Further, no state official retains veto power over the Board's actions. Therefore, the Court finds that the composition of the Board, despite having state representation, does not evidence a strong degree of state control over TSAC's functions.

■ In considering the entity's autonomy, a court will consider whether the entity engages in activities that exemplify independence, such as the power to create its operational structure, to hire and fire employees, to enter into contracts, and to acquire property. *Duke*, 127 F.3d at 979. The statute does mandate that TSAC perform certain functions, such as administering state funds earmarked for the purpose of financial aid, administering a minority teaching fellows program, and administering a scholarship program for future teachers. §§ 49–4–203, 212, 707. However, TSAC's Board is authorized to create the rules and regulations governing such programs, as well as the rules and regulations governing its central functions. *Id.*, *see also* § 49–2–204. TSAC is also authorized to enter into contracts with existing non-profit corporations to make available

low cost banking credit to needy students. § 49-4-205. As mentioned, any damages that may flow from a breach of contract would come from the coffers of TSAC, and not the state. The broad authority of the Board also includes the power to invest any funds, and such proceeds become TSAC's property. The Legislation does not provide any limitations on the structure of operations or who is hired to effectuate TSAC's purpose. *See, e.g., Hufford,* 912 F.2d at 1341 (finding it instructive that statute preserved the entity's independence in matters concerning the purchase of equipment, the selection of personnel, and the hiring, firing, and setting of salaries of such personnel). And, although 49-4-208 requires that TSAC employees have the same benefits as state employees, all contributions are paid by TSAC, and not by state funds. The Court finds, therefore, that this factor weighs against TSAC's status as an arm of the state.

#### 4. *Source of entity's funding*

 The source of the agency's funding may help determine the nexus between the agency and the state. Receiving state funds, however, it is not dispositive in favor of finding an entity an arm of the state, as many entities receive substantial state funding, but nevertheless are deemed autonomous. *See, e.g., Mount Healthy,* 429 U.S. at 280, 97 S.Ct. at 573 (holding that school district not an arm of the state despite receiving a significant amount of state money); *Duke,* 127 F.3d at 980 (finding school district was not an arm of the state, despite the district receiving ninety-eight percent of its funding from the state).

TSAC receives funding from the state. In 1998, it received $21,530,783 from Tennessee. However, TSAC also received $54,683,940 from the federal government, and $7,567,571 from other sources. There-

fore, in 1998, approximately seventy-five percent of its funding came from sources other than the state. Additionally, TSAC is authorized to invest in federal securities, as well as federal and state bonds. § 49-4-206. Such income, by state law, becomes TSAC's assets. This structure is consistent with the Legislature's intent, which is that TSAC operate its programs through a revolving fund. § 49-4-505. Nevertheless, this factor weighs in favor of finding TSAC an arm of the state.

#### 5. *Nature of TSAC's function*

In the instant case, the Tennessee Legislature created TSAC for the purpose of guaranteeing student loans. Lending and guaranteeing loans is not a function that is traditionally performed only by governmental entities. *Parks School of Business, Inc. v. Symington,* 51 F.3d 1480, 1486 (9th Cir.1995). As one court has remarked, the business of lending money and guaranteeing student loans can hardly be argued to be performing "central governmental functions" such as collecting taxes, maintaining roads, defense, and policing. *In re Muir,* 239 B.R. 213, 217 (Bankr.D.Mont.1999); *see also* Jody Freeman, *The Private Role in Public Governance,* 75 N.Y.U.L.Rev. 543, 675 (June, 2000); *"There's Something About Cities": Understanding Proprietary Functions of Texas Municipalities and Governmental Immunity,* 32 Tex. Tech.L.Rev. 1, 19 (2000). In any case, government financing, in the form of loans, occurs at all levels of government, local, state, and federal. Under these circumstances, this factor provides little guidance in discerning whether TSAC's function is more akin to local, rather than state, governmental activities. *Cf. Lake Country Estates,* 440 U.S. at 402, 99 S.Ct. at 1177 (finding that entity's central function was regulating land use, and that land use was traditionally a local, not a state, governmental function).

## B. Summary

In the instant case, the Legislature explicitly insulated the state from any liability that may attach to TSAC. The United States Supreme Court and circuit courts, including the Sixth Circuit, are unlikely to protect an entity as an "arm of the state" when the state itself is not fiscally responsible for any judgments issued against the entity. *Hess,* 513 U.S. at 48, 115 S.Ct. at 404; *Brotherton v. Cleveland,* 173 F.3d 552, 560 (6th Cir.1999); *Hufford,* 912 F.2d at 1341 (11th Cir.1990) (cited with approval by the *Brotherton*); *Duke v. Grady Municipal Schools,* 127 F.3d 972, 974 (10th Cir.1997) (cited with approval by *Brotherton*); *Jackson v. Hayakawa,* 682 F.2d 1344, 1350 (9th Cir.1982); *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.,* 948 F.2d 1084, 1087 (8th Cir.1991); *Baxter v. Vigo Cty. School Corp.,* 26 F.3d 728, 732 (7th Cir.1994); *Jacintoport Corp. v. Greater Baton Rouge Port Comm'n,* 762 F.2d 435, 440 (5th Cir.1985); *Harter v. Vernon,* 101 F.3d 334, 338 (4th Cir.1996); *Bolden v. Southeastern Pa. Transp. Auth.,* 953 F.2d 807, 818 (3rd Cir.1991) (en banc); *Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Auth.,* 991 F.2d 935, 942–43 (1st Cir.1993). Therefore, in balancing the remaining factors, the most important consideration weighs against immunity.

The only factor weighing in favor of finding TSAC is an arm of the state is the source of funding factor. TSAC does receive a portion of its funding from the state, although this funding is not guaranteed. On balance, however, the remaining factors are either equivocal or weigh against finding that TSAC is an arm of the state.

State law does not lend any guidance in determining TSAC's nexus to the state. As to the state's control over TSAC, although a significant minority of TSAC's board members are state officials, they may and do appoint replacements and do not retain any official veto power over the Board's broad discretion to make decisions. Further, the nature of TSAC's activities neither support nor weigh against finding that TSAC is an arm of the state. Its functions, to act as a lender, is not traditionally a governmental function. Although governmental agencies do in fact lend money in various capacities, such activity is not inherently state or local in nature.

Other factors weigh against finding that TSAC is an arm of the state. TSAC's activities reflect those of an autonomous entity. Although the state mandates that TSAC perform certain functions, TSAC has broad discretion to meet those directives. *See Duke,* 127 F.3d at 979 (finding that, though the school district must meet certain state requirements, it performs many duties without state control and supervision). Additionally, it has the power to contract with other entities, to hire and fire employees, to invest, to own property, and to structure its operations.

On balance, the state's treasury will be unaffected by any judgment against TSAC, and the other factors are either equivocal, or militate toward denial of immunity. Accordingly, the Court finds that TSAC is not an arm of the state and is ineligible for Eleventh Amendment protection.

## III. Order

For the foregoing reasons, the Court **AFFIRMS on alternative grounds** the bankruptcy court's decision to deny Defendant's motion to dismiss the case for lack of subject matter jurisdiction. TSAC is not an arm of the state, and is therefore ineligible to receive Eleventh Amendment protection.